TRULOCK v. PAUL.

Opinion delivered December 20, 1926.

1. CONTRACTS—WAIVER—BURDEN OF PROOF.—In a suit for damages for breach of a contract, the defendant, alleging a waiver of such breach, has the burden of proving same.

2. CONTRACTS—WAIVER OF BREACH.—A contract of a lessor of a sawmill to build certain new tenant houses was waived where the lessee operated the mill for six months, and agreed to accept and use vacant houses in lieu of the new houses to be built.

3. LANDLORD AND TENANT—BREACH OF CONTRACT—RIGHT TO RESCIND. —Though a lessor failed to construct certain tenant houses for use

at a leased sawmill as agreed, the lessee was not justified in rescinding the entire contract, where the expense of erecting the houses was comparatively small, but should have made the improvements and deducted the cost thereof from the amount to to paid to the lessor.

Appeal from Jefferson Chancery Court; *Harvey R. Lucas,* Chancellor; reversed.

*Danaher & Danaher,* for appellant.

*J. M. Shaw* and *W. B. Sorrels,* for appellee.

WOOD, J. On the first day of October, 1923, H. E. Trulock and E. L. Paul entered into a written contract by which Trulock agreed to sell and Paul agreed to buy all the merchantable timber on certain lands described in the contract. Under the terms of the contract Trulock leased to Paul a sawmill plant to be used by Paul in the cutting of the timber on the lands described in the contract. Among other provisions the contract contained the following: "The said Paul agrees to furnish sufficient rough lumber to build five houses suitable for residences for his employees. Said Trulock shall furnish all dressed flooring, windows and doors, and all hardware necessary to complete said houses, and shall pay for the labor of building the said houses. The said houses are to be on sites to be selected by the said Trulock, near said mill, promptly, upon the furnishing of the rough lumber by the said Paul, and may be used by the said Paul for his employees at the mill during the continuance of this lease, free of rent, but, upon the expiration of this lease, said houses shall be turned over by him to the said Trulock in as good condition as when same are received by him, reasonable wear and tear excepted."

The contract provided that Paul should enter upon the land and cut the timber promptly and continuously, except when too wet to operate profitably. The contract was to expire within five years from its date.

This action was instituted by Paul against Trulock. Paul set up the contract in his complaint, and alleged that, under the terms of the contract, he took possession

of the mill, organized a labor force and began the performance of the contract; that, after he had cut several thousand feet and after two of the houses specified had been built, he demanded that Trulock build the other three houses specified, which Trulock refused to do, and thereby breached the contract, to Paul's damage in the sum of $11,500, for which he prayed judgment.

Trulock answered, admitting that the contract was executed by him, but alleged that it did not reflect the real agreement between the parties, which was that five houses suitable for residences for Paul's employees should be furnished by Trulock; that these houses might be the houses already on the place or new houses, and, if new houses, Trulock was to furnish the dressed flooring, windows, doors and hardware necessary to complete the houses; Paul would furnish the rough lumber, and Trulock would pay for the labor for building the houses; that the scrivener failed to draw the contract as the parties had agreed to, and it was signed by them through a mutual mistake of fact. Trulock further alleged that, after the contract was entered into, Paul went upon Trulock's place, and Trulock pointed out to him the houses which his hands might occupy, and Paul accepted said houses as being in compliance with the contract, and occupied the same with his laborers; that it was then found that Paul needed more than five houses, and Trulock allowed him the use of nine houses on the place, including two new houses which were constructed by Trulock; that it was agreed between them that the use of these houses was in full compliance with the contract. Trulock denied all other allegations of the complaint, except as admitted, and set up, by way of cross-complaint, that Paul, without just cause, abandoned the performance of the contract, and notified Trulock that he would not perform it; that, at the time of the breach of the contract by Paul, he left in the woods cut logs worth $56.40, which were spoiled and worthless; that he had used wood worth $238.50; that the abandonment of the contract by Paul caused Trulock a loss of $3 a thou-

sand on two million feet of timber left standing on the land. Trulock prayed that he have judgment for damages against Paul in the sum of $6,294.90. He also prayed that the cause be transferred to equity. The cause, without objection, was transferred to the chancery court.

Paul testified, and identified and introduced the contract, the material provisions of which are above set forth. He testified that he proceeded right away to carry out the terms of the contract. He moved his family on the place, hired men, and overhauled the mill and proceeded to cut the timber under the contract, until he had cut about 93,000 feet of lumber. He got everything in shape for the operation of the mill under the terms of the contract. Trulock built only two of the houses called for by the contract. Witness got out the lumber for the other houses, and demanded of Trulock that he build the same, and he refused to do so, saying that he wouldn't build any more. There were no houses on the place suitable for witness' laborers. The houses already on the place were defective. They were negro cabins. Witness' laborers were white, and they refused to live in the houses. The scrivener made no mistake in drawing the contract. The witness demanded of Mr. Trulock that he build the houses two or three times, and he refused to do so. The witness entered into detail, explaining the terms of the contract, and the prices of the various kinds of lumber, and the profit he would have realized thereon if Trulock had complied with the terms of the contract, which would have amounted in the aggregate to more than $13,000. Witness stated that he was anxious to carry out the contract. Witness told Trulock that if he didn't build the houses witness could not finish his contract with him. Witness complied fully with the contract on his part. He stated that Trulock built two houses. Witness did not consent to the use of any of the other houses. He asked Trulock's consent to use them until he got the other houses built. Witness' tenants only occupied them temporarily. None of witness' tenants

moved out before Trulock breached his contract. Witness' tenants refused to live in the shacks, and witness could not operate the mill under those conditions.

On cross-examination of this witness, it was developed that he had occupied as many as six houses on the place while he was engaged in the performance of the contract, but stated that his occupancy, except in the two houses built by Trulock, was temporary. Some of them were shacks and not suitable to live in, and his tenants would not remain. Witness' crew consisted of seven men; four of them lived in the houses mentioned and the other three lived at the boarding-house. The boarding-house man left, and the witness then quit. While witness was running the mill, Trulock told witness that he could occupy other houses until the five houses were built. The two houses were built by Trulock in about two months after witness moved on the place. The testimony of the witness further was to the effect that he occupied the premises in the performance of his contract six months. During that time he cut 93,000 feet of timber; that the reason it took witness this length of time to cut that quantity was because he had to overhaul the mill.

Paul's son and two other witnesses corroborated the testimony of witness Paul.

Trulock testified, in substance, that, after the contract was made, Paul and his son came on the place and batched two or three weeks, and then the ladies came down, and refused to live in the houses that Paul had before accepted for his own use, and Paul informed witness of that fact. When the contract was originally made, Paul agreed, on account of labor conditions, which were bad, and the number of vacant houses witness had on the place, that he would use these houses. At different times Paul and his employees occupied eleven different houses. They had as many as nine at one time, and part of the time had a full crew. Witness kept his tenant houses in good repair. They were better than the average tenant houses. Witness agreed to build

two new houses in order to satisfy the women folks of two of Paul's employees. The testimony to the effect that the houses were not fit to live in was not true. When the houses were assigned to Paul's laborers, they took them without complaint and lived in them until Paul quit running the mill. Witness had a talk with Mr. Hibbetts, one of Paul's employees. Hibbetts had testified that he left the place, after staying two weeks, because the houses were not fit to live in. Trulock testified that Paul asked him to build another house for Hibbetts. At that time the boarding-house was vacant, and witness asked why not give him that, and Paul replied that it was not good enough for him to live in. Witness then stated that the agreement was they would build houses only as they were needed, and witness told Paul it was not good business to build more houses when there were plenty of good vacant houses on the place. The next time witness met Paul he informed witness that he was going to leave because witness had made it impossible for him to operate. Paul informed witness that he was going to shut down the mill, but expected to hold the timber and the two houses, and that he would log the stuff and ship it off that way. Witness wrote Paul, two or three days after that, to ask him what he intended to do about the timber. Paul didn't reply, and in four or five days he sent witness the keys to the office, and witness did not hear anything more until this suit was filed. Witness further stated that, two or three days after the contract was signed, Paul and witness agreed that witness should build one house for Paul and his family to live in and one for Vanyard Paul and his family, and that Paul then agreed to use the other houses already on the place, and he did accept those houses, and that there was no further objection until the Hibbetts matter came up, about the first of March.

Four witnesses corroborated the testimony of Trulock in regard to the condition of the houses on the place. Their testimony tended to prove that the houses were in better condition than the average plantation

houses. One of these witnesses stated that, while Paul was on the place running the mill, he and his hands at one time occupied nine houses. One of them stated that the houses that Paul lived in and the one that Robinson lived in were better than the average. These houses were built near the mill.

Another witness testified that, after the trade was made, Paul and Vanyard Paul and their wives came down to look over the situation and pick out the place to live. After expressing some dissatisfaction with the houses, they came back and made arrangements with Trulock to build a house for Paul and one for Vanyard Paul. Paul was to furnish the lumber and Trulock the smooth lumber, doors, windows, and labor. Two or three days after witness went to Paul's office and told him that the next house would be built near the mill grounds. Paul said, "There is no use in that. Harry and I have agreed not to build any more houses. There are plenty of them here good enough for this labor."

In rebuttal, Paul testified that he had not entered into an oral agreement with Trulock, after the written contract, by which Trulock was not to build more houses. Witness had never agreed with Trulock to use the houses already there, except according to the contract. Witness occupied the houses six months temporarily. He had no conversation with Davis or anybody else waiving witness' right to have houses built.

The court found that Trulock had refused to carry out the contract; that Paul would have received a profit of $3,852.14 if Trulock had complied with his contract, and entered a decree in favor of Paul for that sum, from which is this appeal.

1. We have not set out the testimony in regard to the alleged damages because we have concluded that, if there was a breach of the written contract on the part of the appellant in failing to furnish dressed flooring, windows and doors and all hardware necessary to complete three houses, and in failing to pay for the labor of building said houses, as provided in the written contract and

as alleged in the complaint, then a preponderance of the evidence proves that such breach of contract was waived by the appellee. We are convinced that the appellee agreed to accept and use for his laborers the vacant houses already on the premises, in lieu of the three new houses that the appellant contracted to build. The fact that appellee remained six months on the premises in the performance of his contract, after he knew the condition of the houses on the premises, and operated the mill plant in the manufacture of timber into lumber until he had produced 93,000 feet of lumber, tends strongly to prove that he had waived the breach of contract on the part of the appellant in not performing his part of the contract. The appellant contends that the appellant and the appellee, after the written contract was entered into, entered into an oral contract with reference to the three houses that had not been built, under the terms of which the parties agreed that the appellant should build two new houses; and the appellee agreed, if appellant would do so, appellee would use the other vacant houses already on the place. One of the witnesses testified that Paul said that he and Trulock had agreed not to build any more houses. True, Paul himself denied that he had any conversation with any one waiving his right to have the houses built, but the appellant and another witness testified that he did enter into such an agreement. The positive testimony therefore preponderates in favor of the appellant on the above proposition. The length of time that appellee operated under the contract and the amount and character of work done, and other circumstances, it occurs to us, likewise corroborate the appellant's testimony and sustain his contention that the appellee waived any breach of the contract on his part. This issue is purely one of fact, and the burden is upon the appellant to prove the waiver. This he has done.

2. It will be observed that the contract requires that the appellant should furnish the "dressed flooring, windows and doors and all hardware necessary to complete said houses, and shall pay for the labor of build-

ing said houses.'' The appellee had entered into possession of the premises, and appellant had built the two houses, and the appellee was proceeding to perform the contract and had continued such performance for a period of six months, producing 93,000 feet of lumber. Such being the situation, the appellee would not be justified in abandoning the further performance of his contract and maintaining an action for damages against the appellant as for a breach of the entire contract on the part of the appellant because of the latter's failure to further perform the contract in the furnishing of material and the paying for labor prescribed therein. This was a contract that involved the sale of 2,000,000 feet of timber. Appellee had already cut 93,000 feet of the timber, and he alleges, and his testimony tends to prove, that, if the contract had been fully performed by both parties, he would have realized more than $13,000 profit. In a contract of this magnitude, the failure of the appellant to build three houses, which, according to his testimony, would have cost from fifteen to eighteen hundred dollars, including the cost of the rough material, which appellee did not have to pay, would not be such a substantial part of the contract as would justify the appellee, upon the failure of appellant to perform it on his part, to treat the contract as breached in its entirety by the appellant and to warrant a recovery of damages by the appellee. The consideration involved in the cost of these houses does not bear such a relation to the consideration of the entire contract as to warrant the appellee in claiming damages for breach of the contract after having abandoned the performance of the contract on his own part. Such, we conceive, would not be a reasonable construction of the contract, considering the same from the viewpoint of the parties when the contract was made. The appellee himself, by the abandonment of the contract on his part, under the circumstances disclosed by this record, must be held to have waived the breach of the contract, if any, on the part of the appellant.

In *Youngs* v. *Berman,* 96 Ark. 78, 131 S. W. 62, we held, quoting syllabus: "Where there has been a breach of agreement on the part of a landlord to make repairs, if the repairs are extensive and the cost excessive in comparison with the rent, the measure of the tenant's damages is the diminution in the rental value of the property by reason of such non-repair; but, where the repairs are inexpensive as compared with the rent, the measure of the tenant's damages is the cost of making the repairs." See also *Johnson* v. *Ingram,* 134 Ark. 345, 203 S. W. 836. That principle, by analogy, is applicable here. If the appellant failed to perform the contract on his part, as contended, the appellee, instead of abandoning the contract, should have made the improvements himself and deducted the cost thereof from the amount to be paid appellant. Appellee should have continued in the performance of his contract. Then he would have been in an attitude to maintain an action for damages against the appellant growing out of appellant's failure to perform the contract on his part. Since the appellee did not do this, but himself abandoned the contract, he must be held thereby to have waived the alleged breach on the part of appellant in the particulars alleged.

The decree of the trial court is therefore reversed, and the appellee's complaint will be dismissed for want of equity.

HUMPHREYS, J., not participating.